IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Tabitha Marie Wilson, )<br>            Plaintiff,  )<br>      vs.                  )<br>Carolyn W. Colvin, Acting  )<br>Commissioner of Social Security,  )<br>            Defendant.  ) | Civil Action No. 6:14-4322-TMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

   This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

   The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

   The plaintiff filed an application for disability insurance benefits ("DIB") on October 18, 2012, alleging that she became unable to work on January 28, 2010. The application was denied initially and on reconsideration by the Social Security Administration. On October 21, 2013, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and her mother, Annetta Byers, appeared on May 14, 2014, considered the case *de novo* and, on June 12, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council

denied the plaintiff's request for review on September 2, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1) Claimant meets the insured status requirements of the Social Security Act on September 30, 2015.

(2) Claimant has not engaged in substantial gainful activity since January 28, 2010, the alleged onset date (20 C.F.R §§ 404.1571 *et seq*).

(3) Claimant had the following severe impairments: bipolar disorder, generalized anxiety disorder, post-traumatic stress disorder (PTSD), fibromyalgia, and obesity (20 C.F.R. § 404.1520(c)).

(4) Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5) After careful consideration of the entire record, I find that claimant has the residual functional capacity to perform light work as defined in 20 C.F.R §§ 404.1567(b) with some additional limitations. Specifically, claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently. She can stand, walk, and sit for 6 hours each in an 8-hour day. Claimant is restricted from climbing ladders, ropes, and scaffolds. She occasionally can crawl and climb ramps and stairs. She frequently can stoop, kneel, and crouch. She frequently can handle and finger with her upper extremities. Claimant is limited to understanding, remembering, and carrying out simple instructions. She may have only rare public contact.

(6) Claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7) Claimant was born on June 16, 1978, and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

2

(8) Claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9) Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10) Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 C.F.R. § 404.1569 and 404.1569(a)).

(11) Claimant has not been under a disability, as defined in the Social Security Act, from January 28, 2010, through the date of this decision (20 C.F.R. § 404.1520(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of

3

Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

> preponderance.  If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is "substantial
> evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4ᵗʰ Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4ᵗʰ Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4ᵗʰ Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 31 years old on her alleged disability onset date and a few days away from her 36ᵗʰ birthday on the date of the ALJ's decision.  The plaintiff has an eleventh grade education and received a GED (Tr. 179) and has past relevant work experience as a care-giver, cashier, gas station attendant, and mail sorter/distributor (Tr. 180).

On January 20, 2010, the plaintiff was seen for depression at Palmetto Primary Care Physicians.  She could not sleep or focus.  She experienced, irritability, insomnia, fatigue, and panic attacks (Tr. 510). On February 5, 2010, the plaintiff was seen again for depression and panic attacks.  Her speech was being affected, and she could not sleep (Tr. 508)

On February 14, 2010, the plaintiff went to the emergency room after slipping and falling on ice, injuring her hip and back (Tr. 371-76).  There was no radiographic evidence of acute fracture, no significant soft tissue changes, and no significant degenerative or osteoporotic changes on plain film (Tr. 374, 399).

On April 2, 2010, the plaintiff reported being nervous and fidgety.  She was feeling panicky and had pressured speech. She was diagnosed with worsening anxiety (Tr.

5

506-07).   On April 12-19, 2010, the plaintiff had a voluntary admission to Palmetto Behavioral Health for mood swings and depression.  She had been unable to function due to her inability to control her emotions.  She was prescribed Buspar, Neurontin, Lamictal, Geodon, Valium, Vistaril, and Ultram and diagnosed with bipolar personality disorder and depression (Tr. 255-68).  At the time of discharge, the plaintiff reported improvement in her symptoms with a decrease in anxiety and better control over her mood (Tr. 262).

On April 26, 2010, the plaintiff was seen for pain in her left knee after falling during her psychiatric hospitalization (Tr. 503).  An MRI of the plaintiff's left knee showed a bone bruise of the patella and an irregularity of cartilage (Tr. 536).  On April 30, 2010, the plaintiff had swelling in her left leg.  She was referred to an orthopedist, and Oxycodone was prescribed (Tr. 502).  On June 25, 2010, the plaintiff continued to have left knee pain and stiffness (Tr. 496).

The record includes treatment notes from Paul Robbins, M.D., of Oasis Christian Counseling covering the period of November 2010 through July 2013 (Tr. 425-48, 767-801).  The record documents the plaintiff's report of traumatic events, several losses, and life stressors (Tr. 427-48).  The plaintiff reported anxiety, stress, or sadness during some visits (*See e.g.* Tr. 428, 430, 432, 438).  She had difficulty with nightmares after seeing four people who had died in a fire.  She was diagnosed with bipolar disorder, post traumatic stress disorder ("PTSD"), and depression (Tr. 447).  Otherwise, mental status examinations were benign (Tr. 427-48).  The plaintiff's eye contact was generally good and her thought processes were generally logical and goal directed (*id.*).  The plaintiff's cognition was mostly reported as grossly intact, and her memory and attention/concentration were intact (Tr. 427, 429-436, 438-444, 446-448).  The plaintiff's insight and judgment were consistently fair to good (Tr. 427-48).

On December 8, 2010, the plaintiff had left knee and foot pain.  She was also diagnosed with morbid obesity (Tr. 491-92).

6

On December 22, 2010, the plaintiff reported increased stress and anxiety. She had taken extra Ambien and Klonopin in the previous two weeks (Tr. 446). On January 5, 2011, the plaintiff had increased stress and anxiety from relationship issues with her boyfriend (Tr. 445).

On January 8, 2011, the plaintiff was seen in the emergency room for an injury to her right wrist after an alleged physical assault by her boyfriend (Tr. 294-295). On January 10, 2011, the plaintiff reported back and wrist pain and muscle and joint weakness (Tr. 489). She also had a contusion to her right orbit after an apparent domestic assault (Tr. 298-99).

On February 2, 2011, the plaintiff was still having problems sleeping. She had been too sedated with the Trazadone, Seroquel combination. Lunesta was prescribed (Tr. 444). On February 22, 2011, the plaintiff stated that she experienced extreme sedation. She had fallen asleep at a red light and in her bath tub. She also had episodes where she could not sleep and reported sleeping only two hours since February 18 (Tr. 443). On March 2, 2011, Scott Christie, M.D., noted that the plaintiff had decreased concentration and an increased thought process and mood lability (Tr. 442).

On February 21, 2011, the plaintiff reported insomnia and fatigue. She alternated between being fatigued and having increased energy. She was diagnosed with uncontrolled bipolar disorder (Tr. 487-88).

On March 15, 2011, the plaintiff had swelling in her left lower extremity (Tr. 485). On March 16, 2011, the plaintiff was seen for left leg pain and swelling (Tr. 300).

On April 27, 2011, the plaintiff reported mood swings and rage. She experienced irritability. She had flashbacks to chronic physical abuse by her stepfather (Tr. 440). On May 11, the plaintiff had increased anxiety, which caused diarrhea (Tr. 439). On June 8, 2011, the plaintiff was tearful with suicidal ideation of drowning or burning herself. She heard voices of family members (Tr. 438). On June 22, 2011, it was difficult to assess

7

the plaintiff's mood due to her extreme anxiety.  She had thoughts of her childhood abuse as she was dealing with her ex-fiancé and domestic violence (Tr. 437).

On February 3, 2012, the plaintiff was seen for depression, suicide ideation, and homicidal ideation.  She had cut herself four times since June 2011 for relief from anxiety.  She had a knot in her throat that she had been told was due to anxiety.  She experienced obsessive thoughts of stabbing herself in the hands (Tr. 436).  On February 29, 2012, the plaintiff's Klonopin dosage was increased due to anxiety and disability (Tr. 435).

On March 10, 2012, the plaintiff reported chest pain with difficulty breathing (Tr. 482).  On March 12, 2012, the plaintiff had worsening edema and paresthesias.  She reported that the Lortab did not help.  Flexeril was prescribed.  The plaintiff also had worsening bipolar mood disorder and appeared more anxious (Tr. 480-481).  On March 19, 2012, the plaintiff's anxiety had decreased and her mood was good, but by April 24 she had increased panic attacks due to relationship problems with her mother.  The lithium dosage was increased (Tr. 433).

On March 23, 2012, the plaintiff had right hand pain and numbness.  She was diagnosed with bilateral carpal tunnel syndrome, severe on the right and moderate on the left.  She also had a C7-8 radiculopathy with chronic multilevel cervical spondylosis (Tr. 538).  Also on March 23rd, the plaintiff reported fatigue.  Her energy level interfered with physical, social, and occupational functioning.   She appeared depressed and was diagnosed with bipolar mood disorder (Tr. 460-62).

On March 31, 2012, an MRI of the cervical spine showed degenerative disc disease at C4-5 with a central disc protrusion producing flattening of the spinal cord and mild central stenosis (Tr. 535).

On April 16, 2012, the plaintiff presented to Keith D. Merrill, M.D., complaining of having no feeling in both hands for the past three months (Tr. 277).  She was diagnosed

8

with carpal tunnel syndrome and underwent carpal tunnel release on May 24, 2012 (Tr. 274, 279, 384).

The plaintiff reported falling on June 1, 2012, opening up her right hand wound (Tr. 274). She went to the emergency room following the fall for debridement of her wounds (*id.*). Dr. Merrill noted that the plaintiff was doing fine with mild wound breakdown in her right hand (Tr. 275). He instructed the plaintiff to follow-up in one month (Tr. 274). Dr. Merrill stated that the plaintiff's pain should diminish within the next few days (Tr. 275).

On July 21, 2012, the plaintiff reported that her father had died in a motor vehicle accident. She had severe sleep disruption (Tr. 431). On August 6, 2012, Dr. Robbins wrote that the plaintiff had seen visions of people and heard voices calling her name. Her medications were increased (Tr. 430).

On August 13 and 20, 2012, the plaintiff had nausea and chest pain. She was diagnosed with panic attacks (Tr. 469, 473). On August 20, the plaintiff stated that she heard voiced that predicted future events. She continued to have severe anxiety and chest pain along with the audio hallucinations (Tr. 429).

On September 12, 2012, the plaintiff reported increased intrusive thoughts of past traumas and abuse. The plaintiff's severe anxiety limited her sleep. She was depressed with severe anxiety and PTSD symptoms (Tr. 428). On October 1, 2012, the plaintiff had very low motivation and was grieving the loss of her father (Tr. 427). On November 1, 2012, Dr. Robbins diagnosed the plaintiff with severe anxiety (Tr. 801). On November 21, 2012, the plaintiff reported returning nightmares from childhood with demonic overtones (Tr. 800).

On December 11, 2012, the plaintiff had a headache and left knee pain with swelling (Tr. 599). On December 14, 2012, the plaintiff had pain and swelling in her left leg. She was told to elevate her leg and take Lasix. Her psychiatrist would be consulted regarding medications that caused weight gain and edema (Tr. 596-97).

9

On January 7, 2013, the plaintiff was depressed and had severe anxiety. She had tested positive for ovarian and cervical cancer. She stated she had short term memory problems and decreased concentration (Tr. 796-98).

On January 9, 2013, Lisa Clausen, Ph.D., reviewed the plaintiff's records and opined that she had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace (Tr. 67-72). On September 24, 2013, Judith Von, Ph.D., opined the same (Tr. 85).

On January 11, 2013, an MRI of the plaintiff's lumbar spine showed facet arthropathy of the lower lumbar spine (Tr. 602)

On January 21, 2013, Nancy Lembo, M.D., of Carolina Spine & Sport Rehabilitation, saw the plaintiff for left knee and leg pain. The plaintiff stated she had fallen in 2010, fracturing her patella and sustaining ligament damage.(Tr. 670-71). Her gait was antalgic, and she had pain in her knee and calf with swelling, associated numbness, and tingling (Tr. 670-71). Examination of her spine did not reveal any evidence of a thoracolumbar shift (Tr. 671). There was no point tenderness in the midline. There was tenderness over the paraspinal muscles bilaterally. Range of motion was within normal limits. There was no tenderness over the posterior superior iliac spine ("PSIS"). On neurologic examination, the plaintiff had swelling and erythema in her left leg. Her calves were tender, and her pulses were palpable. Her motor strength was 5/5. Deep tendon reflexes were 2/4. Sensory examination was abnormal on the left. Slump testing was normal (*id.*). The examiner diagnosed swelling in the plaintiff's left lower extremity, dysesthesias of her left lower extremity, and left knee osteoarthritis with meniscal pathology (Tr. 672). A bone scan was negative for reflex sympathetic dystrophy (Tr. 664, 696-97). The plaintiff was treated with pain medication (Tr. 661-73, 678-82).

10

On January 29, 2013, the plaintiff was seen by Dr. Robbins and exhibited mixed manic and depressed symptoms of bipolar personality disorder. She had increased anxiety, irritability, and sleep disruption (Tr. 795).

On February 4 and 18, 2013, the plaintiff returned to Dr. Lembo with left leg pain and swelling (Tr. 665-68). On March 4, 2013, Dr. Lembo diagnosed the plaintiff with left knee osteoarthritis with meniscal pathology (Tr. 664).

On February 26, 2013, the plaintiff was in conflict with her common law husband. There was increased conflict at home accompanied by stress-induced hives, sleep disruption, and anxiety. She was scheduled to start therapy with a new therapist (Tr. 790-92).

On March 6, 2013, the plaintiff stated that her husband had moved out. She had severe anxiety, and her sleep was very disrupted. She was severely anxious with hives (Tr. 787-89). On March 14, 2013, the plaintiff reported over-sedation with her current medications (Tr. 784). On April 3, 2013, the plaintiff had increased anxiety due to memories of past abuse resulting in panic attacks (Tr. 781-83).

On April 5, 2013, Tom Brown, M.D., opined that the plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and stand, walk, and sit about six hours. She could frequently climb ramps and stairs and never climb ladders, ropes, and scaffolds. She could occasionally balance, stoop, kneel, crouch, and crawl (Tr. 69-70).

On April 29, 2013, the plaintiff had leg, arm, and wrist pain. She experienced muscle aches, pain, and cramps. She was referred to rheumatology due to unrelieved chronic pain and myalgias (Tr. 757-59).

On April 30, 2013, the plaintiff saw Robert Schoderbek, M.D., for evaluation of left knee pain (Tr. 852-54). On examination, the plaintiff had full range of motion and stable ligaments (Tr. 853). Dr. Schoderbeck noted no joint line tenderness. She had full

11

strength with knee flexion and extension.  Her sensation was intact to light touch distally with two to three second capillary refill.  Dr. Schoderbek assessed knee pain, chondromalacia patellae, and patella femoral syndrome (*id.*).

On May 3, 2013, the plaintiff was also seen for ongoing panic attacks (seven to nine a day).  She was depressed and anxious (Tr. 778-80).

On May 8, 2013, the plaintiff still had an antalgic gait, and she reported that the pain moved to her hands, arms, and her entire spine, as well as her persistent pain in the left leg and knee (Tr. 677-79).  The plaintiff reported that the pain was moving and was now in her hands, arms, entire spine, as well as persistent pain in the left knee and leg (Tr. 678).

On May 27, 2013, the plaintiff began treatment with Tony Owens, Jr., M.D., for her left knee pain and bilateral lower extremity pain.  She had an antalgic gait favoring her left side and abnormal reflexes (Tr. 830-31).

On May 31, 2013, Dr. Robbins wrote that the plaintiff had extreme anxiety with eight to ten panic attacks daily.  She had intrusive thoughts of past trauma and wanted to drown herself in the lake by her house (Tr. 775).  On June 13, 2013, the plaintiff returned with panic attacks and anxiety (Tr. 772).

On June 24, 2013, the plaintiff's range of motion was restricted in the cervical spine.  She also had bilateral lower extremity pain and headaches (Tr. 833-34).  Dr. Owens treated the plaintiff through April 2014 (Tr. 826-45).  The plaintiff was diagnosed with chronic pain syndrome, pain in her limb and her joint, cervalgia, lumbago, and lumbosacral spondylosis without myelopathy (Tr. 826-45).  ).

On July 11, 2013, the plaintiff reported twelve to sixteen panic attacks a day.  She had ongoing anxiety, especially in social situations (Tr. 769).

On July 15, 2013, the plaintiff saw Rachel Matilda Wolfe, M.D., for evaluation of muscle pains that kept her up at night.  Dr. Wolfe noted decreased range of motion in

elbows, wrists, and hands secondary to pain (Tr. 804-21).   Laboratory tests were not suggestive of any underlying autoimmune disease, such as lupus or rheumatoid arthritis (Tr. 804).  On July 17, 2013, Dr. Owens considered lumbar medial branch blocks for the plaintiff's lumbar pain (Tr. 838).  On July 22, 2013, Dr. Wolfe diagnosed the plaintiff with fibromyalgia.  The plaintiff had tenderness to palpation of all the small joints of the hands and wrists bilaterally.  Given the complexity of the plaintiff's psychiatric regimen, Dr. Wolfe was hesitant to add new medications (Tr. 804-809).

On August 14, 2013, the plaintiff reported lumbar and cervical pain, and, on August 27, 2013, she received bilateral L3-S1 medial branch blocks (Tr. 840-42).   On September 10,  2013, the plaintiff returned with lumbar and cervical spine pain.  She reported that the medial branch block benefitted her for four or five days (Tr. 844, 893).

On October 1, 2013, Mary Lang, M.D., opined that the plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds, and stand, walk, and sit about six hours. She was limited to frequent bilateral upper extremity pushing and pulling.  She could occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds.   She was limited to frequent stooping, kneeling, and crouching, and occasionally crawling. The plaintiff was also limited to frequent right upper extremity fingering and handling, and she should avoid concentrated exposure to hazards (Tr. 87-88).

On November 5, 2013, the plaintiff reported shortness of breath, chest pressure, and dizziness (Tr. 863).

On December 12, 2013, and January 14, 2014, the plaintiff had lumbar pain, neck pain that radiated to her shoulders and bilateral knee pain.  Her range of motion was restricted in her cervical and lumbar spine (Tr. 896-900).

On March 6, 2014, the plaintiff was seen for recurrent headaches, obesity, depression, bipolar personality disorder, and anxiety attacks.  She was prescribed Maxalt

13

for the migraines (Tr. 856).  On March 14 and April 14, 2014, the plaintiff had back and neck pain with muscle spasms. She also reported pain in her hands (Tr. 902-904).

On April 28, 2014, Dr. Robbins completed a Mental Impairment Questionnaire (Tr. 847- 51).  Dr. Robbins indicated that the plaintiff had diagnoses of bipolar affective disorder, type I, most recently depressed, and PTSD (Tr. 847).  He reported that the plaintiff's highest Global Assessment of Functioning ("GAF") score in the past year was 60[1] (*id.*).  Dr. Robbins indicated that, over the past three years, the plaintiff had periods of depression and anxiety lasting weeks to months that were so severe she was unable to get out of bed (Tr. 848).  He indicated that the plaintiff received treatment consisting of medication management and psychotherapy with good response until she suffers another trauma in the future (*id.*).  Dr. Robbins anticipated that the plaintiff would miss work more than three times a month, she would have difficulty tolerating the stress of everyday life, and she was unable to tolerate the stress of any job (Tr. 850).  He stated that when the plaintiff becomes anxious, her muscles become tense and that increases her back pain (Tr. 849).  According to Dr. Robbins, the plaintiff had slight restriction in activities of daily living, marked difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence or pace, and repeated episodes of deterioration or decompensation (Tr. 850-51).

On May 14, 2014, Dr. Owens completed a multiple-choice Clinical Assessment of Pain form (Tr. 906-07).  Dr. Owens circled that (1) pain is present to such an extent as to be distracting to adequate performance of daily activities or work; (2) greatly

---

[1]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See*  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.* A GAF schore between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  *Id.*

increased pain is likely to occur and to such a degree as to cause distraction from the task or even total abandonment of the task; (3) significant side effects can be expected to limit the effectiveness of work duties or the performance of such everyday tasks such as driving an automobile, etc.; (4) pain and/or drug side effects can be expected to be severe and to limit effectiveness due to distraction, inattentiveness, drowsiness, etc.; and (6) treatments of this kind have no appreciable impact or have only briefly altered the level of pain that this patient experiences (Tr. 907). Dr. Owens was unable to answer multiple-choice question number (5), which asked, "[i]in your best judgment, what are the long-term prospects of recovery for this patient in regard to level of pain? (*id.*).

***Administrative Hearing***

The plaintiff testified that she last worked on January 28, 2010. She was asked to leave her job by her supervisor and was told to go on family medical leave and seek psychiatric help. She testified that she did not have a good relationship with people, and she left her jobs at Family Dollar and at Lowe's because of problems with supervisors. The plaintiff left her job at the post office because her severe trauma affected her so severely that she was physically and mentally unable to do the work (Tr. 42-43).

The plaintiff testified that her fibromyalgia made her skin feel like it was on fire and someone was using a cheese grater to rake her skin off. She had a hard time wearing clothing. A lot of times she had to lie down and cover up with a sheet. She felt that way on a daily basis. The plaintiff weighed 241.6 pounds and was 5'2.5". Her weight affected her mobility and aggravated other conditions. She had severe hip and knee pain and could not stand or sit for very long. She could not stoop or squat. Bending over was extremely difficult, and she could not reach for or pick up things that weighed more than three pounds. She could not walk very far (Tr. 43-45).

The plaintiff had been admitted to the Palmetto Behavioral Health Center for one week after a psychotic episode where she attacked her best friend. She went to the

center to try to get on the correct medications.  The plaintiff took anti-psychotic medications, which caused her to gain weight and made her very drowsy.  Some of her medications caused her to be unable to focus. The plaintiff lived with her aunt because she could not cook, clean, and wash her own clothes or brush her own hair.  Her aunt helped her with those chores.  Her mother also came and helped her on a daily basis (Tr. 45-47).

The ALJ asked the plaintiff to describe the meltdown at her last job.  The plaintiff said she did not remember what led up to the incident, but she did not handle stress well and she had difficulties with relationships, including her family members.  During the incident at work, the plaintiff was unable to control her emotions, she was very loud, and she was becoming very aggressive.  She was unable to control herself.  She was frustrated with her supervisor and with the job itself.  The plaintiff left the post office job because a loved one had passed away and she was not able to do the requirements of the job after taking an 8-week period of leave.  The ALJ asked the plaintiff about the psychotic episode in which she attacked her best friend.  The plaintiff stated that she was not in control of her emotions, and she physically and violently attacked her best friend.  The record showed she had mood swings and depression.  The plaintiff had not been hospitalized since April of 2010, but Dr. Robbins had repeatedly advised her to go for more inpatient care.  She did not want to return to Palmetto Behavioral Health because she was afraid they would not let her back out (Tr. 50-53).

The plaintiff's mother, Ms. Byers, testified that the plaintiff had suffered from undiagnosed bipolar disorder since she was ten years old.  She had relationship problems with her siblings and other family members.  It had been difficult until she was diagnosed and was put on proper medications.  Byers stated that the plaintiff had not been able to keep a job because she had issues maintaining relationships.  In 2006, there was a fire that killed Byers's niece, the niece's boyfriend, and two of the three children.  The plaintiff lived with Byers's sister because she lived closer to the metro area.  Byers testified that the

16

plaintiff suffered from the same problems that others in her family had suffered from. The plaintiff tried her best, but her problems would take over and debilitate her to where she did not get out of bed or get dressed. She slept too much. It hurt her to walk and go in places. She could not go grocery shopping anymore. Family members tried to help her out and take care of her. Byers did not think the plaintiff could work a job that required only simple, repetitive instructions because the plaintiff could not sit, stand, or walk for very long. Her knees and back were bad and her hands caused her to drop things all of the time. Byers had observed the plaintiff not want things to touch her body due to her fibromyalgia. Byers testified that the plaintiff dropped out of school when Byers and her husband were getting a divorce and the plaintiff could not bear to be around the ex-husband any longer. The plaintiff also had problems with other students and authority figures at school (Tr. 54-59).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to obtain vocational expert testimony; (2) failing to properly explain the residual functional capacity ("RFC") assessment; (3) failing to properly assess opinion evidence; and (4) failing to properly assess her credibility.

### *Vocational Expert Testimony*

The plaintiff argues that the ALJ erred in relying on the grids at step five of the sequential evaluation process as vocational expert testimony was warranted. Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *See Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir.1992); 20 C.F.R. § 404.1520(f)(g). To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids"). However,

> Each grid considers only the strength or exertional component
> of a claimant's disability in determining whether jobs exist that

17

> the claimant is able to perform in spite of his disability. Thus, in cases where pain occurs only upon exertion and limits one's strength functioning, the grid tables will apply. But when a claimant suffers from both exertional and nonexertional limitations, the grid tables are not conclusive but may only serve as guidelines.

*Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir.1989) (citing *Wilson v. Heckler*, 743 F.2d 218 (4th Cir.1984)); *see also* 20 C.F.R. § 404.1569a(d). While "not every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids, the proper inquiry . . . is whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable." *Walker*, 889 F.2d at 49. When the Commissioner is unable to rely on the grids, he must prove through additional evidence, such as testimony of a vocational expert, that jobs exist in the national economy that the claimant can perform. *See id.* at 49–50.

The ALJ determined that the plaintiff's additional limitations - no climbing ladders, ropes, and scaffolds; occasional crawling and climbing ramps and stairs; frequent stooping, kneeling, and crouching; frequent handling and fingering; understanding, remembering, and carrying out simple instructions; and rare public contact - "have little or no effect on the occupational base of unskilled light work," and, therefore, he relied on the grids, which directed a finding of "not disabled" (Tr. 29-30). The undersigned agrees with the plaintiff that this was error.

As argued by the plaintiff (pl. brief at 26), the ALJ's conclusory finding that a limitation on social interaction would not significantly erode the occupational base because unskilled work "usually involves working with objects rather than people" is unsupportable. *Lowther v. Colvin*, C.A. No. 9:12-cv-2603-RBH, 2013 WL 5743855, at *4 (D.S.C. Oct. 23, 2015) (citing *Anthony v. Comm'r of Social Sec.*, No. 11–1400, 2012 WL 4483790, at * 27 (N.D.Ohio Sept. 27, 2012) (finding that because someone performing unskilled work must be able to appropriately respond to supervisors and co-workers on a sustained basis, it was

18

error for the ALJ to rely on the grids for a claimant who had moderate social limitations) and *Phillips v. Astrue*, *v. Astrue*, C.A. No. 4:11-cv-1018-JMC-TER, 2012 WL 3765184, at * 4 (D.S.C. June 11, 2012), *adopted by* 2012 WL 3775968 (D.S.C. Aug.30, 2012)).  The ALJ specifically found that the plaintiff had moderate difficulties in social functioning (Tr. 21). "Moderate difficulties in maintaining social function would affect the occupational base for unskilled work, precluding reliance on the Grids to direct a finding of not disabled."  *Id.* (citations omitted).

Furthermore, the ALJ found that the plaintiff had moderate difficulties in concentration, persistence, and pace based on her "severe mental impairments" (Tr. 21) and included a limitation in the RFC finding to "understanding, remembering, and carrying out simple instructions"[2] (Tr. 22).  At step five, the ALJ stated, "The limitation to understanding, remembering, and carrying out simple instructions, would not preclude unskilled work" (Tr. 29-30).  As the Honorable Patrick Michael Duffy, Senior United States District Judge, has stated:

> Although the Commissioner argues that the ALJ's reliance on the grids was adequate, because the ALJ accounted for Claimant's nonexertional limitation by limiting him to unskilled work and the grids only encompass unskilled work, the court does not believe the ALJ's general restriction prohibiting Claimant from performing skilled work adequately proves the Commissioner met its burden of establishing that Claimant's concentration deficiency had little or no effect on the occupational base of unskilled, light work.

---

[2]Following the ALJ's decision in this case, the Court of Appeals for the Fourth Circuit issued an opinion finding that an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the claimant to simple, routine tasks or unskilled work.  *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (joining the Third, Seventh, and Eighth Circuits)).  This issue was not specifically raised by the plaintiff here but should be considered by the ALJ upon remand.

*Sherby v. Astrue*, 767 F. Supp. 2d 592, 599 (D.S.C. 2010).   Judge Duffy found the

reasoning of the Honorable Joseph F. Anderson, Jr., Senior United States District Judge,

in *Bonds v. Astrue*, persuasive:

> The ALJ further found this nonexertional impairment limited plaintiff to unskilled jobs. In making this determination, the ALJ, in effect, became a vocational expert. Whether plaintiff's moderate impairment in the area of concentration, persistence and pace limited plaintiff to one and two step jobs and whether such eroded the occupational base and to what degree it was eroded was a determination for a vocational expert. While the ALJ may be correct that jobs calling for simple and/or one to two step instructions may be unskilled sedentary jobs, such jobs also require an individual to perform repetitive tasks over an eight-hour work day. Plaintiff's nonexertional impairment of moderate limitation in the area of concentration, persistence and pace could directly affect plaintiff's ability to remain attentive and concentrate. This could directly affect plaintiff's ability to perform simple sedentary work, such as assembly line work, unskilled in nature, which the ALJ found plaintiff capable of performing. It may be that a vocational expert can identify unskilled sedentary jobs which would not be affected by plaintiff's nonexertional limitations. It may also be that a vocational expert would find limitations in the area of concentration, persistence and pace, would affect such jobs and further erode the number of unskilled sedentary jobs available. Reversal and remand is required so a vocational expert can be called and can address the issue.

No. 07–1135, 2008 WL 2952446, at *11 (D.S.C. July 29, 2008) (quoting *Chapa v. Astrue*,

No.2:05-cv-0253, 2008 WL 952947, at *6 (N.D. Tex. April 8, 2008)).

Based upon the foregoing, the undersigned finds that the ALJ erred in relying

on the grids at step five given the plaintiff's significant nonexertional impairments. *Walker*,

889 F.2d at 49.  Therefore, remand in recommended so that vocational expert testimony

may be obtained as to whether or not the plaintiff can perform a significant number of jobs

in the national economy given her impairments.  *See Phillips*, 2012 WL 3765184, at *4

("Because Plaintiff's depression is a severe non-exertional impairment and the ALJ

restricted Plaintiff to work requiring only simple, routine, and repetitive tasks with limited

social interaction, it is likely that the Plaintiff cannot perform the full range of work activity within a Grid category. Moderate difficulties in maintaining social functioning or concentration, persistence or pace, would obviously affect the occupational based for unskilled work, precluding reliance on the Grids to direct a finding of not disabled. Therefore, remand is recommended so that a VE may be called to address proper hypotheticals which include all of the Plaintiff's impairments and identify any jobs which Plaintiff could perform with his non-exertional limitations."); *Cain v. Astrue*, C.A. No. 08-cv-2632-GRA, 2009 WL 3698112, at *4 (D.S.C. Nov. 2, 2009) (finding the ALJ erred by solely relying on the grids to find the claimant not disabled after determining that the claimant suffered from severe nonexertional impairments, including mild to moderate limitations in social functioning and concentration, persistence, and pace).

### *Remaining Allegations of Error*

With respect to the remainder of the plaintiff's contentions of error, on remand the ALJ will be able to reconsider and re-evaluate the evidence as part of the reconsideration of those claims. *Hancock v. Barnhart*, 206 F.Supp.2d 757, 763–764 n.3 (W.D. Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect as it is vacated and the new hearing is conducted *de novo*). Specifically, the ALJ should consider the plaintiff's arguments that he erred in failing to include in the RFC assessment limitations resulting from her carpal tunnel syndrome, left knee impairment, and lumbar and cervical back impairments (pl. brief at 19-24); in giving little weight to the opinions of Dr. Robbins, her treating psychiatrist, and Dr. Owens, her pain management specialist (*id.* at 29-36); and in failing to properly consider her credibility (including failing to consider the side effects of her medications or explain which daily activities were inconsistent with her subjective complaints) (*id.* at 36-39).

21

## CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

December 21, 2015
Greenville, South Carolina